Edward M. Anderson (SBN 198183)
Regina Yeh (SBN 266019)
ANDERSON YEH PC
401 Wilshire Boulevard, 12th Floor
Santa Monica, California  90401
Tel: (310) 496-4270  Fax: (888) 744-0317
edward@andersonyehlaw.com
regina@andersonyehlaw.com

Attorneys for Plaintiff
BETHANY ASHTON WOLF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETHANY ASHTON WOLF, an individual; <br><br>       Plaintiff, <br><br>    v. <br><br> JOHN RICKARD, an individual; WRIGLEY PICTURES, a California Corporation; ALAN OU, an individual; BOIES/SCHILLER FILM GROUP LLC, a Florida limited liability company; MIDNIGHT SUN, LLC, a Nevada limited liability company; ERIC KIRSTEN, an individual; OPEN ROAD FILMS, LLC, a Delaware limited liability company; and DOES 1 through 20; <br><br>       Defendants. | CASE NO.: 2:16-CV-09116 <br><br> **COMPLAINT FOR:** <br><br> **1) COPYRIGHT INFRINGEMENT PURSUANT TO 17 U.S.C. § 101, ET SEQ.;** <br><br> **2) BREACH OF CONTRACT;** <br><br> **3) BREACH OF IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING;** <br><br> **4) BREACH OF CONFIDENCE;** <br><br> **5) BREACH OF FIDUCIARY DUTY (CONSTRUCTIVE FRAUD);** <br><br> **6) FRAUD; AND** <br><br> **7) NEGLIGENCE** <br><br> **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      This case is about a fraudulent scheme by a Hollywood film producer and his co-defendants to steal an award-winning female writer-director's motion picture project, in circumvention of the producer's express agreement to attach her as writer-director.  In Hollywood at its worst, the producer and his co-defendants replaced her with a previously uncredited male writer and previously uncredited male director.  The producer and his co-defendants have refused to offer the writer-director any compensation whatsoever, even though the producer and his co-defendants do not deny having blatantly used her work.

2.      Plaintiff BETHANY ASHTON WOLF ("WOLF" or "PLAINTIFF") is an award-winning motion picture writer-director and producer.  She built her growing list of credits largely by betting on her own talents.  Among other work, WOLF has a portfolio of original passion projects that she created and that she will only agree even to pitch for sale or license on the condition that she be attached as both writer and director, should a potential producer or financier desire to use it.  WOLF spent years developing one such project entitled "Midnight Juliet."  The work is a heart-wrenching young adult romance set in a small California coastal community, where a young woman with a rare, real-life disease that makes her deathly allergic to sunlight falls in love with a young man with his own demons to conquer as he faces fundamental choices about his own future.  WOLF wrote the project as an original work, registered her extremely detailed, thirty-plus page treatment for the project with the United States Copyright Office, the Writers Guild of America, and applied for film society financing grants (becoming a finalist to win such a grant) – all before any contact with any of the defendants.

3.      In October 2012, defendants JOHN RICKARD ("RICKARD") and ALAN OU ("OU") agreed to attach WOLF as the writer-director of a potential remake of a 2006 Japanese film entitled "Taiyo no Uta" (or "Song of the Sun"), if WOLF would deliver her already written "Midnight Juliet" treatment and synopsis to them and allow

RICKARD and OU to remake "Taiyo no Uta" using WOLF's work.  PLAINTIFF is informed and believes and thereon alleges that, unbeknownst to WOLF at the time, RICKARD and OU had no intention of ever allowing WOLF to direct the project or to attach her as a director.  WOLF accepted their fraudulent offer, delivered the treatment and synopsis to them, and agreed it could be used as the basis for the remake, in addition to orally painting the picture for the two of how the treatment should be directed.  After taking WOLF's work and using it for months, RICKARD and OU informed WOLF that they were reneging and she would never be the director of the project, but begged her to write a full screenplay and accept a renegotiated writer-only attachment.  WOLF immediately informed RICKARD and OU that she would not agree to the proposed new terms and they could not use the treatment for the remake on that basis -- or at all if they were not going to honor the original deal.  RICKARD and OU led WOLF to believe that the "Midnight Juliet" treatment would not be used in their planned "Taiyo no Uta" remake, since RICKARD and OU were refusing to honor the original bargain.

4.       RICKARD and OU partnered with defendants BOISE/SCHILLER FILM GROUP, LLC ("BOISE/SCHILLER") for the "Taiyo no Uta" remake, which they have re-named "Midnight Sun."  RICKARD circulated the shooting script for "Midnight Sun" in the industry, although pointedly never to PLAINTIFF or her representatives.

5.       The reason why RICKARD failed to communicate with PLAINTIFF about the status of the project became clear when PLAINTIFF obtained a copy of the "Midnight Sun" screenplay, which purports to be "written by" defendant ERIC KIRSTEN ("KIRSTEN").  The "Midnight Sun" screenplay deeply incorporates the effective entirety of WOLF's "Midnight Juliet" treatment.  Neither RICKARD nor any other defendant has offered to compensate WOLF in any manner, or even to negotiate with her in good faith about any compensation terms.

6.       On October 13, 2016, industry trades reported that a RICKARD-produced "Midnight Sun" film had been acquired by defendant OPEN ROAD FILMS, LLC

("OPEN ROAD") for planned wide U.S. theatrical distribution in the summer of 2017. PLAINTIFF is informed and believes and thereon alleges that the referenced "Midnight Sun" motion picture is based on the clearly tainted and infringing KIRSTEN screenplay, which will permanently destroy any realistic possibility of WOLF ever commercially distributing and producing "Midnight Juliet" as a separate project.

7.     WOLF seeks an appropriately tailored injunction regarding defendants' commercial release or further distribution or exploitation of the KIRSTEN "Midnight Sun" screenplay, and any motion picture or other works based on it, and monetary damages.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

8.     The Court has exclusive original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1338 and on the grounds that PLAINTIFF'S first claim for relief arises under the Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*

9.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over PLAINTIFF'S second through seventh claims for relief, all of which arise under state law.  All seven of PLAINTIFF'S claims for relief arise from a common nucleus of operative facts, such that the state law claims are so related to the federal question claims that they form part of the same case or controversy under Article III of the United States Constitution.

### *Personal Jurisdiction*

10.     The Court has personal jurisdiction over each of the defendants in that each of the non-Doe defendants resides within the State of California and within this district, and/or is regularly doing business within the State of California and this district.  PLAINTIFF is informed and believes and thereon alleges that discovery or further investigation will also show that some or all of the Doe defendants reside within

the State of California and within this district, and/or are regularly doing business within the State of California and this district.  Further, with respect to each defendant, including all of the Doe defendants, a substantial portion of the relevant acts complained of occurred within the State of California and this district.  With respect to PLAINTIFF'S intentional tort claims, each of the defendants to those claims engaged in intentional acts expressly aimed at the State of California, causing harm that defendants knew was likely to be suffered in the State of California, and PLAINTIFF'S claims arise out of or are related to the defendants' forum-related activities.  The specific facts of personal jurisdiction with respect to each defendant are detailed further herein.

### *Venue*

11.     Venue is proper in the United States District Court for the Central District of California, Western Division, pursuant to 28 U.S.C. § 1400(a), because all defendants or their agents either reside or may be found within this district within the meaning of said statute, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district and/or a substantial part of property that is the subject of the action is situated here.

### **PARTIES**
### *Plaintiff*

12.     ***Bethany Ashton Wolf:*** Plaintiff BETHANY ASHTON WOLF is an individual and at all times relevant herein was a citizen and resident of the State of California and County of Los Angeles.  Prior to formally legally changing her name to Bethany Ashton Wolf (which she did at a point between 2010 and the present) from her prior legal name, WOLF worked under the name Bethany Ashton Wolf as a pseudonym.  WOLF has been producing, writing and directing films for nearly twenty years.  Wolf began her career co-writing the short film "Don's Plum," starring A-list Hollywood talent, including an Academy Award-winning actor.  She expanded into

directing, initially by writing and directing two award-winning short films, "The Burgundy Room," and "Wait," followed in 2006 by the feature-length "Little Chenier," which WOLF produced, wrote and directed.  "Little Chenier" won more than twenty awards on the film festival circuit, including ten Best Picture awards and six International Best American Film Awards.  WOLF has had numerous screenwriting assignments for both independent companies and major studios, including "On the 12th Day" (Radio London Films), "Bullrider" (Elevation Films), "The Pilgrimage of Layla" (Riche Productions), and "Other People's Love Letters" (CBS Films and Laurence Mark Productions).  In 2013, WOLF produced, wrote and directed the short film "Love Scene," which won Best Short and Best Screenplay awards all over the world.  WOLF is currently the writer-director of a feature film in post-production and expected to compete in festivals in early 2017.  WOLF also has other projects set up and in active development.  She has, and at all times relevant herein has had, experienced professional talent representation who arrange pitch meetings, negotiate agreements, and otherwise assist WOLF in conducting business in the motion picture industry, including pursuant to the industry's established customs and practices.

### *Named Defendants*

13.  ***John Rickard:*** Defendant JOHN RICKARD is an individual and PLAINTIFF is informed and believes and thereon alleges that at all times relevant herein, RICKARD was a citizen and resident of the State of California, County of Los Angeles.  RICKARD is a professional motion picture producer, whose credits include "Horrible Bosses," "Jack the Giant Slayer," "How To Be Single," and "Horrible Bosses 2."  PLAINTIFF is informed and believes and thereon alleges that during at least some of the times relevant herein, RICKARD did business under the fictitious business name "Rickard Pictures."  PLAINTIFF is informed and believes and thereon alleges that RICKARD is currently the President of defendant WRIGLEY PICTURES.  PLAINTIFF is informed and believes and thereon alleges that RICKARD regularly

does business in this district, including from WRIGLEY PICTURES' principal place of business in Burbank.  RICKARD is listed on IMDbPro as a credited producer on the as-yet-unreleased motion picture "Midnight Sun," and representatives of some of the defendants have in the past transmitted correspondence directed to PLAINTIFF stating that RICKARD personally controls all rights in the "Midnight Sun" project.

14.    ***Wrigley Pictures:*** Based on public records, PLAINTIFF is informed and believes and thereon alleges that defendant WRIGLEY PICTURES is a corporation organized under the laws of the State of California, with its principal place of business at 4000 Warner Boulevard, Building 76, Burbank, California.  PLAINTIFF is informed and believes and thereon alleges that WRIGLEY PICTURES is a motion picture production company operated by RICKARD, that WRIGLEY PICTURES is a successor-in-interest to Rickard Pictures with respect to "Midnight Sun," that RICKARD has assigned some or all of his rights in the "Midnight Sun" project to WRIGLEY PICTURES, and/or that WRIGLEY PICTURES otherwise has an interest in the "Midnight Sun" project.

15.    ***Alan Ou:*** Defendant ALAN OU is an individual and PLAINTIFF is informed and believes and thereon alleges that at all times relevant herein, OU was a citizen and resident of the State of California and the County of Los Angeles.  Based on PLAINTIFF's interactions with him, PLAINTIFF is informed and believes and thereon alleges that at all relevant times herein, OU has personal interests in the "Midnight Sun" project.  OU is listed on IMDbPro as an executive producer on "Midnight Sun."

16.    ***Boies/Schiller Film Group LLC:*** Based on public records and other publicly available information, PLAINTIFF is informed and believes and thereon alleges that defendant BOIES/SCHILLER FILM GROUP LLC is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  PLAINTIFF is informed and believes and thereon alleges that BOIES/SCHILLER regularly conducts business in this district, including business related to the development, financing, production and distribution of motion

pictures, including "Midnight Sun" specifically.  Based on industry trade publications, IMDbPRO, and communications received by PLAINTIFF from or on behalf of BOIES/SCHILLER and other defendants, BOIES/SCHILLER owns or controls rights in the "Midnight Sun" project and/or is a financier and producer of same.

17.     ***Midnight Sun, LLC:*** PLAINTIFF is informed and believes and thereon alleges that defendant MIDNIGHT SUN, LLC is a limited liability company organized under the laws of the State of Nevada and with its principal place of business either in Santa Monica, California or in Boca Raton, Florida.  PLAINTIFF is informed and believes and thereon alleges that MIDNIGHT SUN, LLC regularly conducts business in this district, including business related to the development, financing, production and distribution of motion pictures, including "Midnight Sun" specifically.  According to public records, MIDNIGHT SUN, LLC has a registered agent located in Santa Monica, California.  Based on communications received by PLAINTIFF from or on behalf of MIDNIGHT SUN, LLC and other defendants, MIDNIGHT SUN, LLC owns or controls rights in the "Midnight Sun" project and is a financier and/or producer of same.

18.     ***Eric Kirsten:*** Defendant Eric Kirsten ("KIRSTEN") is an individual. Based on KIRSTEN's location listings on social media, PLAINTIFF is informed and believes and thereon alleges that KIRSTEN is and was at all times relevant herein was a citizen and resident of the State of California, County of Los Angeles.  KIRSTEN is listed as having "written by" credit on the "Midnight Sun" screenplay, and is identified as the screenwriter of the "Midnight Sun" motion picture project both on IMDbPro, and in industry trade reports.  Based on IMDbPro and industry trade publications, PLAINTIFF is informed and believes and thereon alleges that, prior to "Midnight Sun," KIRSTEN had no produced screenwriting credits, and was best known in the industry for an unproduced screenplay entitled "Lighthouse," which in 2012 was on Hollywood's "Black List" of unproduced, but well-regarded screenplays.

///

19.    ***Open Road Films:*** Based on public records, PLAINTIFF is informed and believes and thereon alleges that defendant OPEN ROAD FILMS, LLC is a limited liability company organized under the laws of the State of Delaware and with its principal place of business in the State of California, County of Los Angeles.  OPEN ROAD is a well-known motion picture producer and distributor and regularly does business in this district, including business related to the development, production and distribution of feature films.  Based on reports in the industry trades and IMDbPro, PLAINTIFF is informed and believes that OPEN ROAD acquired at least U.S. distribution rights in the film "Midnight Sun" in or about October 2016, that this film is based on the KIRSTEN "Midnight Sun" screenplay, and that OPEN ROAD presently plans a wide commercial theatrical release of the picture in or about July 2017.

### *Doe Defendants*

20.    PLAINTIFF is in the process of identifying and confirming the true names and capacities of the defendants designated as DOES 1 through 20, inclusive ("DOES"), and therefore sue these defendants by fictitious names at this time.  The DOES are individuals or entities affiliated or related to some or all of the non-Doe named defendants and, on information and belief, are residing in, or otherwise have or had relevant contacts in and with the State of California and this district during the time periods relevant to this Complaint, or are otherwise subject to the jurisdiction of this Court and venue here.  PLAINTIFF will amend her pleading to include the name or names of said individuals and/or entities when PLAINTIFF obtains sufficient information to do so.  PLAINTIFF is informed and believes and thereon alleges that each of the DOE defendants is in some manner or degree responsible and liable for the acts and omissions alleged herein.

///

///

///

- 8 -

*Agency Allegations*

21.    PLAINTIFF is informed and believes and thereon alleges that in all matters and claims for relief alleged herein, each defendant was and/or is acting as the agent of the other defendants, and with the authorization or ratification of the other defendants, and in the course and scope of that agency.  As set forth in greater particularity further herein, each defendant is vicariously liable to PLAINTIFF, including *inter alia* under principles of agency, in addition to being directly liable for his, her or its own conduct.

*Concert of Action/Aiding and Abetting Allegations*

22.    PLAINTIFF is informed and believes and thereon alleges that in all matters and claims for relief alleged herein, each defendant, even if they did not themselves personally cause the harm to PLAINTIFF, gave advice or encouragement to the other defendants to act, operated as a moral support for the other tortfeasor defendants, knew the acts encouraged to be tortious, and said advice, encouragement and/or moral support and/or assistance was a substantial factor in causing the resulting torts.  Further, each of said defendants either actively took part in the tortious activity, or furthered it by cooperation or request, or lent aid or encouragement to the wrongdoers, or ratified or adopted the wrongdoers acts done for their benefit.  Each of said defendants thus engaged in a concert of action with the direct tortfeasors, aided and abetted the direct tortfeasors, and or is otherwise a joint tortfeasor with the direct tortfeasors.  As set forth in greater particularity further herein, each defendant is vicariously liable to PLAINTIFF, including *inter alia* under principles of concert of action and aiding and abetting, in addition to being directly liable for his, her or its own conduct.

///

///

///

COMPLAINT

*Conspiracy Allegations*

23.     PLAINTIFF is informed and believes and thereon alleges that defendants RICKARD and OU engaged in conduct that constituted formation and operation of a conspiracy resulting in damage to PLAINTIFF, including from acts done in furtherance of their common design.  PLAINTIFF is informed and believes and thereon alleges that one or more other defendants likewise were parties to the conspiracy at its inception or subsequently joined the conspiracy by entering into the common design with RICKARD and OU and the other conspiring defendants, and committed one or more acts in furtherance of the common design.  As set forth in greater particularity further herein, each defendant is vicariously liable to PLAINTIFF, including *inter alia* under principles of conspiracy in addition to being directly liable for his, her or its own conduct (except as to the limits of conspiracy doctrine with respect to legal inability of a defendant to conspire to breach a duty which the defendant does not legally owe to the PLAINTIFF directly).

24.     PLAINTIFF is informed and believes and thereon alleges that defendants RICKARD and OU entered into the conspiracy and committed the first acts in furtherance thereof in or about October 2012, and that RICKARD and OU and one or more other defendants have continued to commit acts in furtherance of the conspiracy through at least as late as November 2016, specifically including falsely stating to other defendants and to third parties that PLAINTIFF said in October 2012 that she had seen the Japanese film "Taiyo no Uta" and used it as a basis for her original work "Midnight Juliet," and also specifically falsely denying to other defendants and to third parties that RICKARD and OU expressly entered into a writer-director attachment agreement with PLAINTIFF in or about October 2012 regarding "Midnight Juliet" and "Taiyo no Uta."

///
///
///
///

COMPLAINT

## **FACTUAL BACKGROUND**

### ***Xeroderma Pigmentosum***

25.     Xeroderma Pigmentosum ("XP") is an extremely rare, but very real, genetic disease afflicting approximately one in 250,000 individual in the general human populace worldwide, and occurring with about six times that frequency among people of Japanese descent.  Afflicted individuals are easily damaged by, and deficient in their ability to repair, exposure to ultraviolet light, including ordinary sunlight.  In extreme cases, even small amounts of exposure to sunlight can be fatal.

26.     Popular culture is replete with fictional stories featuring or even revolving around one or more characters afflicted with XP, dating back to least 1988.  By way of example only, popular works featuring characters with XP include "Dark Side of the Sun" (a 1988 independent film starring Brad Pitt), "Children of the Dark" (a 1994 made-for-television motion picture distributed by CBS), the *Moonlight Bay Trilogy* (a series of novels by Dean Koontz published in the late 1990s), *Ultraviolet* (a 1998 British television series), "The Others" (a 2001 motion picture starring Nicole Kidman), "A Cool Moonlight" (a 2003 novel by Angela Johnson), "Second Glance" (a 2003 novel by Jodi Picoult), "Mondscheinkinder" (or "Moonlight Children") (a 2006 German motion picture), and "Eskalofrio" (or "Shiver") (a 2008 Spanish film), among many others.

27.     The idea of a fictional story featuring one or more characters with XP thus has not been novel by itself for some time, well before the events giving rise to the present dispute.

### ***"Taiyo no Uta" ("Song of the Sun")***

28.     "Taiyo no Uta" (or "Song of the Sun") is a 2006 Japanese young adult romance film featuring a character with XP.  In the film, the female lead, Kaoru, is severely afflicted by XP such that she cannot go out during daylight.  She dreams of being a singer-songwriter and plays guitar and sings her own songs at night in front of a

local bus station in her Japanese coastal community.  She becomes interested in a young man named Koji and eventually introduces herself to him one night without disclosing her condition.  Kaoru and her girlfriend then scheme together to learn more about him.  Kaoru soon meets Koji again and subsequently Koji decides to take Kaoru to the city.  After some sightseeing, Koji sings and plays in a public square, drawing an appreciative crowd.  Koji later asks Kaoru out on a date, which ends when Kaoru loses track of time and must flee home before sunrise.  Koji learns of Kaoru's condition. After initially being taken aback, Koji decides to give Koji a gift of recording studio time to make her own CD, which he pays for by working various small jobs.  By the time the recording session arrives, Kaoru's XP has left her unable to play the guitar, although she can still sing.  She requests to record the CD alone in the studio and does so.  Later, Koji takes Kaoru on a promised trip to the beach during the day to watch him surf.  Kaoru goes on the trip in a wheelchair and special suit designed to protect her from the sunlight, accompanied by her father.  Kaoru enjoys the beach adventure with Koji, but is clearly dying.  Her father encourages her to take off her suit and enjoy the moment.  She declines, but enjoys the beach trip, laughing with Koji despite her condition.  In the final scenes, Kaoru's body is shown at rest in a coffin surrounded by sunflowers; Kaoru's friends and family enjoy her CD which is released posthumously; and the film ends with Koji rushing into the waves to surf, remembering Kaoru's voice.

29.    PLAINTIFF is informed and believes and thereon alleges that "Taiyo no Uta" is not itself a wholly original work, but rather is a remake of or was strongly inspired by "C'est La Vie, Mon Cheri," a 1993 Hong Kong romance film with a similar plot (although where the fatal illness is bone cancer, not XP).  PLAINTIFF is informed and believes and thereon alleges that "C'est La Vie, Mon Cheri" itself was inspired by "Love Without End," a classic 1961 Hong Kong film where the female lead is diagnosed with a fatal illness.

30.    PLAINTIFF is informed and believes and thereon alleges that "Taiyo no Uta" may have enjoyed some popularity in Japan, but never achieved any meaningful

- 12 -

commercial release outside of Japan and a handful of other Asian countries; is not available in either a dubbed or subtitled English-language version; and never has been.

31.     WOLF had no access to "Taiyo no Uta" (or the prior works upon which it is based) prior to late 2015, and had never even heard of "Taiyo no Uta" prior to late summer 2010 (after WOLF had created and registered "Midnight Juliet" with the Copyrigh Office and the Writer's Guild of America).  Of the other XP works referenced herein, prior to preparing this complaint, WOLF had only ever heard of "The Others."

### *"Midnight Juliet"*

32.     In 2009 and early 2010 (well prior to late summer 2010 when WOLF first heard of "Taiyo no Uta"), WOLF wrote a thirty-plus page detailed original motion picture treatment for a young adult romance between a young woman afflicted with severe XP who dreams of being a writer, and a young man who fears a shoulder injury has cost him his competitive swimming career and resulting opportunity to escape his coastal small town life.  WOLF titled the treatment "Sun Warrior" (with the alternative title "Shade").  The treatment creates a richly detailed world, fully developed characters, storylines and even a substantial amount of dialogue and some full scenes, in a clearly defined three-act structure: it is much closer to being a complete screenplay than most treatments.  WOLF wrote the treatment under her prior legal name while Bethany Ashton Wolf was technically her pseudonym.

33.     WOLF registered the treatment with the United States Copyright Office, Registration Number TXu001718807, under her then legal name, with Bethany Ashton Wolf listed as her pseudonym, with the registration having a stated effective date of May 6, 2010.  WOLF also registered the treatment or an earlier draft of it with the Writer's Guild of America, in or about March 2010.

34.     WOLF was and is the sole author and owner of the registered "Sun Warrior" treatment and it is an original work.  A copy of the May 6, 2010 copyright
///

- 13 -

registration and the "Sun Warrior" aka "Shade" treatment as deposited with the Copyright Office in 2010 is attached hereto as **Exhibit A**.

35.     Between the May 2010 copyright registration and in or about late summer 2010, WOLF decided to change the title of the treatment to "Midnight Juliet."

36.     In or about summer 2010, WOLF signed with literary managers Magnet Management ("Magnet") and provided Magnet with all of her speculative screenplays and treatments, including "Midnight Juliet."  Magnet believed that "Midnight Juliet" had commercial potential and sent it to CAA as a possible vehicle for Selena Gomez. In the course of communicating with CAA about "Midnight Juliet" in or about late summer 2010, WOLF and Magnet learned that CAA had the English-language remake rights to a Japanese young adult XP romance, and that CAA was considering it with Miley Cyrus attached as the female lead (which Japanese film PLAINTIFF is informed and believes and thereon alleges was "Taiyo no Uta").  WOLF had no access to and did not see "Taiyo no Uta" at this time, or any time prior to 2015 (and she has never seen any version with English subtitles or dubbing, nor is WOLF able to understand Japanese).

37.     With the knowledge that there was a major XP romance backed by a major talent agency and with a significant star potentially attached to it already in the Hollywood market, WOLF focused less attention on attempting to advance "Midnight Juliet."  However, she did not abandon the project.

38.     Between 2010 and through to at least October 11, 2012, WOLF continued to make efforts to advance the "Midnight Juliet" project as a motion picture, specifically in the portfolio of her original works that she intended both to write and direct.  For instance, between in or about 2011 and early October 2012, WOLF submitted the project, including the written treatment, to the San Francisco Film Society's Narrative Grants program.  By this time, WOLF also had written an accompanying synopsis to the treatment which changed the story's setting from a small coastal community in Florida to Half Moon Bay, California.  WOLF's "Midnight

Juliet" treatment and synopsis was a finalist for a Hearst Grant from the San Francisco Film Society.  However, as of early October 2012, WOLF had not set up the project anywhere or obtained financing to produce, write and direct it herself.  She remained the property's sole owner.

### Wolf Pitches "Midnight Juliet" to Rickard and Ou and Becomes Attached as Writer-Director of Rickard and Ou's Planned Remake of "Taiyo no Uta"

39.     In or about early October 2012, WOLF had completed an unrelated screenplay assignment and decided to spend time actively pitching her own projects. Among other preparations, WOLF had Magnet contact CAA and inquire about the status of CAA's Japanese XP romance remake project (which PLAINTIFF is informed and believes and thereon alleges was for a remake of "Taiyo no Uta").  It had been nearly two years and WOLF had not seen such a film released or heard that it was moving forward.  CAA communicated that its Japanese XP romance remake project was dead and Miley Cyrus was no longer attached.  With the market apparently clear of a potentially competing project, WOLF put "Midnight Juliet" back on the front-burner of writer-director projects that she owned and wanted to pitch.

40.     In or about October 2012, Magnet arranged a meeting between WOLF on the one hand, and RICKARD and OU on the other hand, for the express purpose, understood by both sides, of WOLF pitching motion picture projects that she had in development and/or controlled that RICKARD and/or OU might want to acquire for development and potential production and exploitation, in exchange for consideration to WOLF.

41.     On or about October 11, 2012, WOLF met in person with RICKARD and OU at the Rickard Pictures offices on Robertson Boulevard in Los Angeles.  At the outset of the meeting, WOLF expressly stated that she had two groups of projects which she could pitch.  In one group, she had projects which she was willing to license or otherwise allow RICKARD and/or OU to use under terms where WOLF would be

- 15 -

attached as a writer only, and not a writer-director (which both sides understood meant would include financial compensation as a writer and with appropriate credits, if the project were used).  In the second group, WOLF expressly explained that she had projects which she was not willing to license or otherwise allow RICKARD and/or OU to use unless WOLF were attached as writer-director of the project (which both sides understood meant would include financial compensation as a writer-director, with appropriate credits, at worst on a pay-or-play basis, but with some real chance at actually serving as writer-director of the picture, if the project were used).  WOLF expressly explained that if RICKARD and/or OU were not interested in WOLF as a writer-director, then she would only pitch projects in the first group (writer-only projects), and not pitch any projects in the second group (writer-director projects).

42.  RICKARD and OU expressly affirmed that they understood the conditions; that they felt positively about writer-directors, and specifically about WOLF as a writer-director; and that WOLF should therefore pitch both types of projects.

43.  With that understanding expressly in place, WOLF proceeded orally to pitch "Midnight Juliet" as a writer-director project.  The oral pitch was extensive, lasting perhaps thirty minutes or more, and included WOLF's creative ideas for direction.  WOLF also made clear that the project had already been reduced to a detailed, existing treatment and synopsis, but WOLF did not provide it to RICKARD and OU at the pitch meeting.  RICKARD and OU listened to the entire pitch without any request that WOLF stop the pitch.  At the conclusion, RICKARD and OU expressed that they loved it.

44.  PLAINTIFF is informed and believes and thereon alleges that, although the "Midnight Juliet" treatment potentially could have been obtained from the U.S. Copyright Office (under the "Sun Warrior" registration), and although WOLF had pitched it to others, including the San Francisco Film Society, RICKARD and OU had not previously been aware of "Midnight Juliet," did not have a copy of the treatment or the synopsis, nor did they know where to obtain copies, except from WOLF.  Further,

- 16 -

because the treatment is registered with the U.S. Copyright Office under the prior title "Sun Warrior," and with the registered author name listed as PLAINTIFF's prior legal name, the chances of RICKARD and OU locating the treatment and obtaining it through the U.S. Copyright Office were lower than otherwise.  In any event, RICKARD and OU did not obtain the "Midnight Juliet" treatment or synopsis in this manner. Identification and delivery of the actual written "Midnight Juliet" treatment and synopsis to RICKARD and OU was novel to them and had its own independent and substantial value to them.

45.    At this point, even had things gone no further in terms of the parties' interactions, RICKARD and OU were already bound by a duty of confidence such that they had incurred an obligation not to use or disclose "Midnight Juliet" without WOLF's consent, and further knew and had bound themselves that WOLF's consent would require writer-director terms for WOLF.  But the parties did engage in further communications, and RICKARD and OU became further bound to additional duties to WOLF.

46.    Specifically, after hearing the oral "Midnight Juliet" pitch, and during this same October 11, 2012 meeting, RICKARD and OU discussed with WOLF that they were aware of a Japanese XP young adult romance film (by which PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU meant "Taiyo no Uta," but which they referred to, either then or later, as "Midnight Sun").  RICKARD and OU said that they believed that the rights to remake the Japanese film in an English-language version were expected to become available at or near the end of 2012 (on or about December 31, 2012).  WOLF acknowledged that she had heard that there had been a Japanese XP romance film remake project floating around the industry, but expressly stated that she had never seen the Japanese film, had created "Midnight Juliet" prior even to being aware such a Japanese film existed, and since becoming aware of the Japanese film had purposely avoided seeing it, since "Midnight Juliet" was her original work, might be viewed as a competing project to a remake of the Japanese

COMPLAINT

film, and WOLF did not want to be influenced by the Japanese film in making "Midnight Juliet" into a feature.

47.    RICKARD, OU and WOLF then expressly discussed the following arrangement, which was specifically initially proposed by RICKARD and OU, and then ultimately accepted by WOLF (some of which may have been discussed in shorthand, but all of which was clearly understood by both sides): if WOLF delivered a copy of her written "Midnight Juliet" treatment and synopsis to RICKARD and OU, and would agree that the "Midnight Juliet" treatment and synopsis could be incorporated into and under the umbrella of an English-language remake of the Japanese film (which either then or later they said would be called "Midnight Sun"), then, if RICKARD and/or OU obtained the rights to, or otherwise were involved in producing a remake of the Japanese film (by which film PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU meant "Taiyo no Uta"), or if RICKARD and/or OU otherwise used the "Midnight Juliet" treatment and/or pitch in re-making the Japanese film, then WOLF would be attached as writer-director of the remake.  Both sides understood this meant at a minimum: a) financial compensation for WOLF as a writer-director, with appropriate credits, at worst on a pay-or-play basis, but at a bare minimum the opportunity to negotiate for same subject to floors established by guild rules, industry custom and practice and/or WOLF's quotes, with some real chance at actually serving as writer-director of the picture, and also b) that WOLF would be entrusting RICKARD and OU with the authority to pitch and otherwise market WOLF's "Midnight Juliet" work in the industry and her further services as a writer-director, at least as part of a "Taiyo no Uta" remake project, and this therefore entailed a relationship pursuant to which WOLF would be placing trust and confidence in RICKARD and OU with respect to "Midnight Juliet."

48.    In the course of this discussion, WOLF again made it crystal clear to RICKARD and OU in express terms that she was unwilling to provide the written "Midnight Juliet" treatment and synopsis to RICKARD or OU or allow them to use any

part of the oral pitch, without a firm commitment and promise that if RICKARD and OU in fact acquired the rights to re-make the Japanese film or otherwise in fact were involved in such a re-make, that WOLF would be attached as not only the writer, but as writer-director.  RICKARD and OU expressly affirmed that they understood the conditions and terms and agreed to them.  PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU understood and knowingly accepted the duties of trust and confidence entailed by the relationship, and/or that RICKARD and OU intentionally misled WOLF into believing that RICKARD and OU so understood and accepted such duties.

49.     On or about October 11, 2012, RICKARD and OU also called Magnet and explained the same proposal and agreement, and Magnet further acknowledged and affirmed it on WOLF's behalf.

50.     The day after the October 11, 2012 meeting, and pursuant to the agreement, WOLF's then-manager emailed electronic copies of WOLF's "Midnight Juliet" written treatment and synopsis to RICKARD and OU.  True and correct copies of the "Midnight Juliet" treatment and synopsis as they were transmitted to RICKARD and OU by email on October 12, 2012 are attached to this Complaint as **Exhibit B**.

51.     Pursuant to the express terms of the specific attachment agreement between WOLF and RICKARD and OU here, and/or implied-in-fact terms of the attachment agreement, including without limitation industry custom and practice, among other obligations RICKARD and OU became obligated at a minimum to inform WOLF if they intended to use, or in fact used, "Midnight Juliet" in development or production of a remake of "Taiyo no Uta."  Among other reasons, this obligation exists to allow attached writer-directors such as WOLF the opportunity to negotiate the terms of their writer-director services and employment with the relevant development and production entity in good faith, but subject to minimum floors established by guild rules, industry custom and practice, and/or the talent's quote, and with some real chance actually to serve as writer-director of the picture.  Precise compensation terms may be

deferred at the attachment stage, including because the appropriate range of potential compensation may depend on the budget of the project, which may or may not have been determined at the attachment stage, and often has not been – making the notice obligation material and, indeed, critical.

52.    Under the circumstances here, the attachment agreement was a fiduciary relationship between RICKARD and OU on the one hand, and WOLF on the other hand, in at least the following aspect, in addition to other potential aspects: because the parties attachment agreement here it was understood, and/or is understood by custom and practice in the industry, that the producer(s) (here, RICKARD and OU) will conduct the "shopping" of the project in the industry including to potential financiers and distributors, the talent in WOLF's position must place trust and confidence at a fiduciary level in the producer(s) to, at a bare minimum, inform the attached writer-director when events occur triggering any performance, compensation right, or right of negotiation by the writer-director, either further with producer, and/or directly with the financier and distributor.  Thus, RICKARD and OU were under and remained under a fiduciary duty to WOLF at least affirmatively to disclose to her the status of the remake project, at a bare minimum as to the status of use of the "Midnight Juliet" treatment and synopsis in the remake project.  In addition, RICKARD and OU also had a fiduciary duty to WOLF to maintain WOLF's negotiating position with a financier or distributor of the project, meaning at the very least a fiduciary duty to WOLF not to give away (disavow or agree to waive) her writer-director negotiation position in any discussions with third parties, and to disclose WOLF's attachment to relevant third parties.

53.    After receiving the "Midnight Juliet" written treatment and synopsis, RICKARD and OU communicated to WOLF and/or WOLF's then-manager that RICKARD and OU had read it and loved it, and indeed were on board as had been agreed.  In fact, RICKARD and OU communicated that they wanted WOLF to write the entire screenplay for the potential "Midnight Sun" remake in full, even though they said that they had not yet obtained the rights to the Japanese film and did not know if they

would be able to.  WOLF communicated that she had other writing projects to finish first, but would be able to start a draft soon.  It was not an obligation or condition under the attachment agreement that WOLF do any writing prior to RICKARD and OU communicating that the Japanese film remake rights actually had been obtained. WOLF also did not have access to "Taiyo no Uta," did not see it at this time, or at any time prior to late 2015, and RICKARD and OU had not provided her a copy. RICKARD and OU nonetheless continued to pressure WOLF to write a full screenplay for the Japanese remake.  RICKARD and OU also reaffirmed in this period (late 2012) that WOLF was attached both to write and direct, and that the parties otherwise had an agreement on the terms as set forth above.

54.    Given WOLF's other screenplay commitments and the lack of provision of a copy of "Taiyo no Uta," and no communication from RICKARD or OU that the remake rights had been obtained, by early 2013, WOLF had not yet commenced further drafting of a full screenplay for the remake (nor was she yet under any obligation to commence that portion of performance).

55.    PLAINTIFF is informed and believes and thereon alleges that at the time of the above discussions, commencing on October 11, 2012, RICKARD and OU, including pursuant to a common design as between them and/or other defendants, secretly had no intention of ever allowing WOLF to be writer-director of any remake of "Taiyo no Uta," or of holding out to others that she was so attached, but falsely stated to WOLF and Magnet otherwise, for the purpose of causing WOLF to deliver the written "Midnight Juliet" treatment and synopsis to RICKARD and OU, which they intended to use in a "Taiyo No Uta" remake if they obtained the rights, but either for no compensation to WOLF, or on less favorable terms that they would force onto WOLF once they had the treatment and synopsis -- and potentially even further writing efforts from WOLF -- in hand.

56.    In the alternative, PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU in fact intended to perform as they promised in the

COMPLAINT

October 11, 2012 meeting at the time that RICKARD and OU made the promises, but that subsequently in discussions with BOIES/SCHILLER and/or another financier, RICKARD and OU relinquished or waived WOLF's writer-director attachment in discussions with BOIES/SCHILLER and/or other defendants and/or third parties, in violation of RICKARD's and OU's fiduciary or other duties of care owed to WOLF, and/or that BOIES/SCHILLER and/or other defendants encouraged, assisted, lent moral support or otherwise enabled or caused RICKARD and OU to abandon or compromise WOLF's writer-director attachment.

### Defendants Obtain The "Taiyo no Uta" Remake Rights And Renege On The Writer-Director Attachment Agreement With Wolf

57.     In early 2013, RICKARD informed Magnet that the Japanese film (by which PLAINTIFF is informed and believes and thereon alleges RICKARD meant "Taiyo no Uta") remake rights had been secured.  RICKARD also communicated that he was changing the terms of the arrangement such that RICKARD and OU (and the remake financing and production group that had been or would be assembled) intended to keep and use "Midnight Juliet" in the remake of the Japanese film, but that WOLF would *not* be attached as writer-director, but instead at most only as a writer; that WOLF would not be the director; and that RICKARD wanted to do a written contract with WOLF to write the full screenplay for the remake based on "Midnight Juliet," but on such renegotiated terms.

58.     WOLF and/or Magnet immediately communicated to RICKARD and OU that this was unacceptable and that WOLF would not waive or agree to modify the writer-director attachment conditions and promises.  There were multiple rounds of telephonic and email communications between the two sides during early 2013 about the issue.  RICKARD entrenched in the newly communicated position, and at the same time pleaded with WOLF to write the screenplay and allow "Midnight Juliet" to be used in the remake on the new, substantially less favorable terms.

59.     On February 11, 2013, Magnet communicated to RICKARD and OU, including in writing, that WOLF was unwilling to agree to the new terms, would not authorize RICKARD and OU to use "Midnight Juliet" in the remake on such terms, stood firm that "Midnight Juliet" could not be used except pursuant to the original writer-director attachment agreement, and that since RICKARD and OU were refusing to honor it, that they should not use the "Midnight Juliet" treatment and synopsis or share those materials with others.

60.     RICKARD and OU responded in such a manner that WOLF was led to believe that RICKARD and OU had acknowledged that they had no right to use "Midnight Juliet" in their Japanese remake project or otherwise; that they would not do so; and that they would not share their copies of the "Midnight Juliet" treatment and synopsis with anyone.

61.     Among other connotations, the parties' communications in or about February 2013 constituted a specific bargain, either express or implied-in-fact: that whether or not WOLF then had any viable legal claims in or about February 2013 against RICKARD and OU (whether for breach of contract, breach of confidence, breach of fiduciary duty, fraud, or anything else), then WOLF would forego pursuing said claims on the condition that RICKARD and OU would make no further use of "Midnight Juliet," nor disclose "Midnight Juliet" to anyone.  Further, to the extent that RICKARD and OU continued to maintain their possession of the specific electronic copies of the "Midnight Juliet" treatment and synopsis entrusted to them by WOLF (a copy of which is attached as Exhibit B) in confidence and not to distribute those specific copies to others or otherwise use them, just as if the electronic treatment and synopsis were a hard copy that RICKARD and OU were entrusted and required to keep safe.

62.     PLAINTIFF is informed and believes and on thereon alleges that RICKARD and OU either entered into the above bargain intending to perform it and bound themselves to it, or, in the alternative, made these acknowledgements and

assurances, or omissions by silence, falsely, and that in fact RICKARD and OU intended to keep and did keep their copies of the "Midnight Juliet" treatment and synopsis, for intended use in their "Taiyo no Uta" remake, and that RICKARD and OU's purpose in making the false representations or omissions to WOLF was to cause her to forebear from immediate suit on any potential claims that she had at that time. WOLF was unaware at the time that these representations and omissions by RICKARD and OU were false, reasonably relied on them, including by not forebearing from brining any claims that she had or might have had at that time.

63.     Further, under the circumstances here, and regardless of whether RICKARD, OU and WOLF came to a forebearance of claims bargain, nonetheless by both custom and practice in the industry and principles of fairness and equity, the contractual obligations, covenant of good faith and fair dealing, fiduciary obligations and/or duty of care obligations of RICKARD and OU survived any termination of the attachment agreement to at least the following extent: RICKARD and OU were under a continuing obligation at a bare minimum affirmatively to notify WOLF if they in fact used "Midnight Juliet" in the "Midnight Sun" project, including so that WOLF could negotiate in good faith the terms of her writer-director relationship to the project, subject to floors established by guild rules, industry custom and practice, and/or WOLF's quote, with some real chance actually to serve as writer-director of the picture.

64.     RICKARD and OU on the one hand, and WOLF on the other hand, thus went their separate ways, subject to the above continuing terms.  PLAINTIFF is informed and believes and thereon alleges, that RICKARD and OU did so while secretly maintaining possession of copies of the "Midnight Juliet" treatment and synopsis with the intent to use them, copy them and distribute them without WOLF's permission or authorization, including as part of making "Midnight Sun."  PLAINTIFF is further informed and believes and thereon alleges that RICKARD and OU also intended intentionally to conceal, and in fact concealed, their use of "Midnight Juliet," and otherwise intended to fail to honor, and did fail to honor, their affirmative

notification duties to WOLF.  Further, PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU intentionally chose to conceal from WOLF their state of mind in said respect, for the purpose of prejudicing her in her position.

65.     Months of silence passed.  On July 11, 2013, representatives of RICKARD sent a letter falsely claiming that "Midnight Juliet" was derived from rights held by RICKARD in "Midnight Sun" ("Taiyo No Uta").  On August 12, 2013, WOLF's representatives sent a letter refuting the false statement, reaffirming that WOLF still had not ever seen "Taiyo no Uta," that the "Midnight Juliet" treatment and synopsis were original to her and owned by her, and which again clearly instructed RICKARD not to use any elements of "Midnight Juliet" in connection with "Midnight Sun."  There was no response from defendants or any of them, and WOLF reasonably believed and relied on that neither RICKARD nor OU nor anyone associated with their remake would make any use of "Midnight Juliet," or that if they changed their minds and decided to use "Midnight Juliet" in their "Midnight Sun" project, that they would affirmatively inform WOLF to allow her an opportunity to negotiate in good faith the terms of a writer-director relationship, subject to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance actually to serve as writer-director of the remake.  WOLF has never waivered from this position.

### Defendants Secretly Use "Midnight Juliet" In "Midnight Sun," Which Is A Remake Of "Taiyo no Uta" And Fail To Honor Their Obligations To Wolf Or Compensate Her In Any Manner

66.     Approximately two years passed with no contact from defendants or any of them.

67.     In 2014, WOLF used her own resources to finance, produce and direct a short video "teaser" based on the "Midnight Juliet" treatment and synopsis.  WOLF placed the teaser online to promote her work and career in general, and specifically her

ongoing efforts to make "Midnight Juliet" into a feature as writer-director.  The

"Midnight Juliet" teaser has been publicly available online since 2014 and still is, at the

following URL: https://vimeo.com/album/3849226.

68.     On or about June 22, 2015, a story appeared in Deadline that RICKARD

and others were producing "Midnight Sun," to star Bella Thorne and Patrick

Schwarzenegger, financed by BOIES/SCHILLER, from a script by KIRSTEN that had

already been written, and with the director (Scott Speer) also already set.  The

"Midnight Sun" screenplay had been distributed to various professionals and potential

producers in the industry by June 22, 2015, as it happened, although pointedly not to

WOLF.  Including because shopping of and negotiations regarding motion picture

projects with potential producers, talent and others are customarily done in private and

confidentially and not made public until an agreed announcement, then, absent

defendants affirmatively contacting WOLF (which defendants did not do), WOLF had

no reasonable way of knowing prior to the June 22, 2015 Deadline piece that

defendants were using "Midnight Juliet" in connection with "Midnight Sun" or that

WOLF otherwise had claims.

69.     Shortly after the June 22, 2015 Deadline story, WOLF obtained a copy of

the "Midnight Sun" screenplay and read it.  The "Midnight Sun" screenplay states on

its face that it is "written by" defendant KIRSTEN.  In the industry, "written by" is a

term of art.  In the context of a screenplay based on pre-existing material, such as a

prior film, the claiming of a "written by" credit implies that in adapting the source

material, there was a substantial enough departure from the source material such that

the adaptation has its own different "story" (and that this new "story" has value

independent of the source material).  A copy of the KIRSTEN "Midnight Sun"

screenplay is attached as **Exhibit C**.  (Because defendants have refused to answer

PLAINTIFF as to whether defendants contend that the KIRSTEN "Midnight Sun"

screenplay is confidential, and because it may still be unpublished, PLAINTIFF has

asked the court to keep Exhibit C under seal.)

70.     At or about the same time as she obtained the "Midnight Sun" screenplay, WOLF made efforts, for the first time, to obtain a copy of "Taiyo no Uta" and to view it.  It was difficult to find any copy of "Taiyo no Uta" at all, and WOLF was never able to locate any version with English-language dubbing or subtitles.  WOLF eventually located the film on a Japanese website, ordered a copy, finally received it and eventually viewed it – for the first time ever and only in a Japanese language version, which she is not able to understand – on or about October 4, 2015.

71.     A comparison of "Midnight Juliet," KIRSTEN's "Midnight Sun" screenplay, and "Taiyo no Uta" is attached as **Exhibit D**.  (Again, because defendants have refused to answer PLAINTIFF as to whether defendants contend that the KIRSTEN "Midnight Sun" screenplay is confidential, and because it may still be unpublished, and because Exhibit D discusses the contents of the screenplay in detail, PLAINTIFF has asked the court to keep Exhibit D under seal.)

72.     PLAINTIFF has contacted defendants and communicated her contention that defendants used "Midnight Juliet" in creating the KIRSTEN "Midnight Sun" screenplay, and defendants have not denied doing so.

73.     Based on comparison of the "Midnight Juliet" treatment and synopsis, the "Midnight Sun" screenplay, and "Taiyo no Uta," and based on the clear and undeniable access that the "Midnight Sun" creative team had to "Midnight Juliet," and based on defendants failure to deny using "Midnight Juliet" in creating the KIRSTEN "Midnight Sun" screenplay, PLAINTIFF is informed and believes and thereon alleges that defendants or some of them (at a minimum, defendants RICKARD, OU and KIRSTEN) actually used "Midnight Juliet" in generating the "Midnight Sun" screenplay.  This includes without limitation in generating the new "story," which KIRSTEN is claiming to be the sole author of by virtue of claiming a "written by" credit.

74.     Under the circumstances here, defendants, including at a minimum RICKARD and OU, and any licensee or assignee of RICKARD and OU, were and are obligated to treat WOLF as attached as both writer and director of the "Midnight Sun"

- 27 -

screenplay and any motion picture based on or using that screenplay. This obligation includes at a minimum paying financial compensation to WOLF as writer-director of "Midnight Sun" on a pay-or-play basis, or at the very least to negotiate in good faith with her regarding such terms, subject to floors set by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance of WOLF actually serving as writer-director of the picture. At the barest minimum, RICKARD and OU were under a contractual, fiduciary and/or other duty of care to at least affirmatively notify WOLF if the "Midnight Juliet" treatment or synopsis were used in the "Midnight Sun" project.

75.    None of the defendants have compensated WOLF, offered to do so, or even made any offers to negotiate with her in good faith about her writer-director terms or any other compensation. Nor have any of the defendants to this day ever affirmatively notified WOLF that "Midnight Juliet" was used in the "Midnight Sun" project, as it clearly was.

76.    WOLF did not know, nor could she have reasonably known on her own, that defendants had in fact used WOLF's "Midnight Juliet" treatment and synopsis in generating the KIRSTEN "Midnight Sun" screenplay (and resulting motion picture) until at the earliest the June 22, 2015 Deadline story and WOLF's resulting investigations. Further, PLAINTIFF is informed and believes and thereon alleges that defendants actively and intentionally, or in the alternative, negligently, concealed their use of the "Midnight Juliet" treatment and synopsis in the "Midnight Sun" screenplay and resulting motion picture while under an affirmative duty to disclose such to PLAINTIFF. PLAINTIFF is further informed and believes and thereon alleges that defendants engaged in any such intentional conduct for the purpose of depriving PLAINTIFF of the ability to exercise or enforce her rights (or if done negligently, the omissions had this effect, to PLAINTIFF's prejudice). PLAINTIFF is informed and believes and thereon alleges that this conduct of active and/or negligent concealment
///

1  was part of and a continuation of the fraudulent scheme conceived by RICKARD and

2  OU in or about October 2012 and that this scheme is ongoing.

3      77.    The running of any and all time bars on any claims for relief or remedies

4  by PLAINTIFF thus did not accrue and/or were tolled and/or defendants are estopped

5  from asserting them, until at the earliest June 22, 2015.  PLAINTIFF is further

6  informed and believes and thereon alleges that some or all of defendants' conduct is

7  part of the same ongoing scheme and conspiracy, such that any and all time bars on any

8  claims for relief or remedies by PLAINTIFF have not yet accrued and/or continue to be

9  tolled and/or defendants continue to be estopped from asserting time bars, through at

10  least November 18, 2016.

11     78.    PLAINTIFF is informed and believes and thereon alleges that the

12  production budget for "Midnight Sun" is on the order of $10 million.  PLAINTIFF is

13  thus further informed and believes and alleges that if defendants had honored their

14  notification, negotiation and compensation obligations to WOLF under the

15  circumstances here, then, pursuant to floors established by guild rules, industry custom

16  and practice, and WOLF's quotes, WOLF would have received no less than $1,000,000

17  (ten percent of the production budget) in combined guaranteed rights transfer

18  compensation and guaranteed compensation for writer-director services.  These

19  amounts would be in addition to a right to contingent compensation based on the actual

20  performance of the "Midnight Sun" film, as well as the reputational and other career

21  benefits of potential actual performance and credit on the "Midnight Sun" picture.

22     79.    PLAINTIFF is informed and believes and thereon alleges that defendants

23  have no intention of paying any compensation to WOLF whatsoever, including because

24  WOLF has demanded payment and all named defendants have either expressly refused

25  or (in the case of OPEN ROAD) remained silent.

26     80.    Moreover, by the time of the June 22, 2015 Deadline story, defendants had

27  already committed the writer-director position to others and the screenplay for the

28  remake was already written.  PLAINTIFF is further informed and believes and thereon

alleges that by October 2015, when PLAINTIFF was able to obtain a copy of "Taiyo no Uta" and review it, "Midnight Sun" had already commenced principal photography. Under these circumstances and based on the other conduct of defendants, particularly RICKARD and OU, WOLF reasonably and justifiably concluded that any demand for the non-OPEN ROAD defendants to honor their attachment obligations and other obligations to WOLF at that time would have been futile.  (OPEN ROAD to PLAINTIFF's knowledge was not yet affiliated in any way with the "Midnight Sun" project in 2015.)

81.     WOLF focused her efforts on building her career.  This included continuing to pursue her own efforts to make "Midnight Juliet."

82.     In late September 2016, unprompted by any contact from WOLF or her representatives, RICKARD contacted representatives for WOLF.  RICKARD's late September 2016 communications were followed by communications to WOLF's representatives in early October 2016 from defendants MIDNIGHT SUN, LLC and BOISE/SCHILLER.  The gist of these late September 2016 and early October 2016 communications was that RICKARD and BOIES/SCHILLER attempted to intimidate and pressure WOLF into agreeing that she had no claims against them, and, further and outrageously, that WOLF would cease further efforts to develop and produce "Midnight Juliet", and would instead limit any distribution or display of her "Midnight Juliet" work to pass-word protected distribution and display for the purpose of career promotion only, even though neither RICKARD nor BOIES/SCHILLER nor MIDNIGHT SUN, LLC had any rights whatsoever relative to "Midnight Juliet."  There was no explanation for these outrageous demands other than that BOIES/SCHILLER did not like that WOLF had made a short "Midnight Juliet" teaser – a teaser that had been on the Internet for approximately two years.  Based on all the circumstances and these outrageous demands, PLAINTIFF is informed and believes and thereon alleges that defendants have no intention of ceasing their improper and tortious behavior toward WOLF and instead are actively pursuing a course of intimidation motivated by

malice, possibly as a smokescreen for RICKARD's and OU's concealment of their extended fraud.

83.     On October 13, 2016, industry trades announced that defendant OPEN ROAD had acquired U.S. distribution rights to "Midnight Sun," and intends a wide release of the film on July 14, 2017.  PLAINTIFF is informed and believes and thereon alleges that the referenced "Midnight Sun" film and the rights acquired by OPEN ROAD are based on the tainted and infringing KIRSTEN "Midnight Sun" screenplay. The same trade announcements also report that defendant BOIES/SCHILLER financed and produced the film with defendants RICKARD and WRIGLEY PICTURES, and PLAINTIFF is informed and believes and thereon alleges that this is accurate.

84.     The market value of PLAINTIFF's "Midnight Juliet" treatment and synopsis will be effectively entirely destroyed if this occurs, under all the circumstances here (if that has not occurred already): the "Midnight Sun" picture, which PLAINTIFF is informed and believes and thereon alleges is substantially based on the KIRSTEN screenplay, incorporates the entirety of "Midnight Juliet" (certainly from the perspective of the market for buyers of such properties) and no reasonable private producer or financier will take "Midnight Juliet" independently if "Midnight Sun" actually is widely theatrically distributed in the U.S.  Even if PLAINTIFF might find a financing source to produce her "Midnight Juliet" project herself, such as a film society under a grant program, it is clear that the defendants have no intention of leaving WOLF in peace.  Rather, they intend to complete a scorched earth misappropriation and ongoing interference with her ability to exploit any of her years of work on "Midnight Juliet," even her ability to make her own projects based on it.

85.     PLAINTIFF thus now seeks relief from this Court.

///

///

///

///

COMPLAINT

# FIRST CLAIM FOR RELIEF

## COPYRIGHT INFRINGEMENT IN VIOLATION OF 17 U.S.C. § 101, *et seq.*

### (*Against all Defendants*)

86.    PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

87.    The "Sun Warrior" aka "Shade" treatment registered with the United States Copyright Office under Registration Number TXu001718807 (Exhibit A), and the "Midnight Juliet" treatment and the "Midnight Juliet" synopsis (the latter two works as attached hereto as Exhibit B), are original (except to the extent that the "Midnight Juliet" treatments and synopsis are derivative of the "Sun Warrior" aka "Shade" treatment) and copyrightable works.

88.    PLAINTIFF has complied in all respects with 17 U.S.C. § 101, *et seq.*, including the filing of copyright registrations, and/or applications for copyright registrations with the Copyright Office in compliance with its rules and regulations, with respect to all three works.

89.    PLAINTIFF is the original author of all three works and exclusively owns all right, title and interest in all three works.

90.    PLAINTIFF is informed and believes and thereon alleges that all defendants have infringed and are infringing PLAINTIFF's exclusive rights in the works in violation of 17 U.S.C. § 106, including without limitation engaging in the following acts without PLAINTIFF's authorization:

      a.  Defendants RICKARD, OU and KIRSTEN copied protected elements of all three of PLAINTIFF's works without authorization in creating the KIRSTEN "Midnight Sun" screenplay, and the resulting "Midnight Sun" motion picture;

      b.  Defendants RICKARD, OU and KIRSTEN created unauthorized derivative works of all three works in creating the KIRSTEN "Midnight Sun" screenplay and the resulting "Midnight Sun" motion picture;

c. All defendants have engaged in unauthorized copying and distribution of all three works to the extent that there has been any commercial distribution of the KIRSTEN "Midnight Sun" screenplay and resulting "Midnight Sun" motion picture within the meaning of the exclusive distribution right given by 17 U.S.C. § 106.

d. In addition to other theories of direct and vicarious liability, defendants BOIES/SCHILLER and MIDNIGHT SUN, LLC are liable for some or all of the above acts pursuant to the doctrine of *respondeat superior*, and/or under the copyright law doctrine of vicarious liability, on the grounds that each of these two defendants had the right and ability to supervise the infringing conduct and had and have an obvious and direct financial interest in the exploitation of copyrighted materials.  These two defendants are also liable for all of the above acts under the doctrine of contributory infringement, on the grounds that each of BOIES/SCHILLER and MIDNIGHT SUN, LLC, with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct.

e. With respect to some or all of the above infringing conduct, defendant OPEN ROAD is liable under the doctrine of vicarious liability, on the grounds that it had and has the right and ability to supervise the infringing conduct and had and has an obvious and direct financial interest in the exploitation of copyrighted materials.  OPEN ROAD is further liable for all of the above acts under the doctrine of contributory infringement, on the grounds that OPEN ROAD, with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct.

91.    Defendants' infringements were and are willful, in bad faith, and executed with full knowledge of PLAINTIFF'S copyrights in the works, and in conscious disregard for PLAINTIFF'S exclusive rights in the protected works.

///

COMPLAINT

92.     Defendants' deliberate infringement of PLAINTIFF'S copyrights has greatly and irreparably damaged PLAINTIFF, and defendants will continue to damage PLAINTIFF greatly and irreparably unless enjoined by this Court.  In the absence of injunctive relief, PLAINTIFF will have no adequate remedy at law.  Accordingly, PLAINTIFF is entitled to an appropriately tailored temporary and permanent injunction in accordance with 17 U.S.C. § 502.

93.     PLAINTIFF is further entitled to recover from defendants the damages, including actual and statutory damages, and including attorneys' fees, PLAINTIFF has sustained and will sustain, and any gains, profits and advantages obtained by defendants as a result of defendant's acts of infringement alleged above.  At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by PLAINTIFF, but PLAINTIFF is informed and believes and thereon alleges that at a minimum such damages reach or exceed $1,000,000.

## SECOND CLAIM FOR RELIEF
### BREACH OF CONTRACT
*(Against Defendants Rickard, Ou, Wrigley Pictures, Midnight Sun, LLC and DOES 1 to 20)*

94.     PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

95.     PLAINTIFF and defendants RICKARD and OU entered into a valid and enforceable oral contract pursuant to which WOLF became attached as writer-director to the "Midnight Sun" project if RICKARD and OU used "Midnight Juliet" in the project, with the contract having the terms and conditions more particularly described above in the recitation of facts, including the terms which survived any termination of the contract, as identified herein.  To the extent any portion of the contract is or was invalid or unenforceable, the remaining portions of the contract are severable such that PLAINTIFF had and has a valid and enforceable contract with RICKARD and OU.

- 34 -

96.     PLAINTIFF and defendants RICKARD and OU also entered into a valid and enforceable oral contract pursuant to which WOLF agreed to forebear on bringing any claims she might have had in February 2013, on the condition and with the promise and consideration from RICKARD and OU that RICKARD and OU would not use "Midnight Juliet" in the "Midnight Sun" project, or otherwise use or disclose "Midnight Juliet and instead would keep "Midnight Juliet" confidential.

97.     PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU assigned rights in the "Midnight Sun" project to MIDNIGHT SUN, LLC and/or WRIGLEY PICTURES and/or DOES 1 to 20, such that either by the express terms of the assignments or by operation of law, MIDNIGHT SUN, LLC and/or WRIGLEY PICTURES and/or DOES 1 to 20 became bound and liable for the obligations of RICKARD and OU regarding the contract or contracts with WOLF, as successors-in-interest to RICKARD and OU.

98.     WOLF completely or substantially performed all conditions, covenants and promises required on her part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented WOLF from performing them, and all conditions precedent to defendants' obligations that WOLF seeks to enforce herein have either been satisfied or waived.

99.     PLAINTIFF is informed and believes and thereon alleges that defendants breached the contract or contracts with WOLF in at least the following ways:

      a.  Failing to notify WOLF that defendants had used "Midnight Juliet" in the "Midnight Sun" project in a timely fashion or at all.

      b.  Failing to afford WOLF an opportunity to negotiate in good faith actually to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to serve as writer-director of "Midnight Sun."

- 35 -

c.   Failing to notify third parties of the existence of WOLF's attachment as writer-director and her rights thereunder.

d.   Failing to preserve and protect WOLF's opportunity to negotiate in good faith actually to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to serve as writer-director of "Midnight Sun."

100.   PLAINTIFF is informed and believes and thereon alleges that defendants' breaches damaged WOLF in an amount to be proven at trial, but believed to be at least $1,000,000.

### THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### *(Against Defendants Rickard, Ou, Wrigley Pictures, Midnight Sun, LLC*
### *and DOES 1 to 20)*

101.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

102.   PLAINTIFF and defendants RICKARD and OU entered into a valid and enforceable oral contract pursuant to which WOLF became attached as writer-director to the "Midnight Sun" project if RICKARD and/or OU used "Midnight Juliet" in the project, with the contract having the terms and conditions more particularly described above in the recitation of facts and otherwise herein, including such portions of the contract as survived any termination.  To the extent any portion of the contract is or was invalid or unenforceable, the remaining portions of the contract are severable such that PLAINTIFF had and has a valid and enforceable written contract with RICKARD and OU.

///

103.   PLAINTIFF and defendants RICKARD and OU also entered into a valid and enforceable oral contract pursuant to which WOLF agreed to forebear on bringing any claims she might have had in February 2013, on the condition and with the promise and consideration from RICKARD and OU that RICKARD and OU would not use "Midnight Juliet" in the "Midnight Sun" project, or otherwise use or disclose "Midnight Juliet and instead would keep "Midnight Juliet" confidential.

104.   PLAINTIFF is informed and believes and thereon alleges that RICKARD, and OU assigned rights in the "Midnight Sun" project to MIDNIGHT SUN, LLC and/or WRIGLEY PICTURES and/or DOES 1 to 20 such that either by the express terms of the assignments or by operation of law, MIDNIGHT SUN, LLC and/or WRIGLEY PICTURES and/or DOES 1 to 20 became and are bound and liable for the obligations of RICKARD and OU regarding the contract with WOLF, as successors-in-interest to RICKARD and OU.

105.   WOLF completely or substantially performed all conditions, covenants and promises required on her part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented WOLF from performing them, and all conditions precedent to defendants' obligations that WOLF seeks to enforce herein have either been satisfied or waived.

106.   Like all contracts under the relevant governing law, which is the law of the State of California, the contract or contracts between WOLF and the defendants referenced herein contained an implied covenant of good faith and fair dealing, imposing on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible, by an act of his or her or its own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.

107.   PLAINTIFF is informed and believes and thereon alleges that defendants breached the implied covenants with WOLF by interfering with and/or failing to cooperate with WOLF in the performance of the contract in at least the following ways:

a. Failing to notify WOLF that defendants had used "Midnight Juliet" in the "Midnight Sun" project in a timely fashion or at all.

b. Failing to afford WOLF an opportunity to negotiate in good faith to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to serve as writer-director of "Midnight Sun."

c. Failing to notify third parties of the existence of WOLF's attachment as writer-director and her rights thereunder.

d. Failing to preserve and protect WOLF's opportunity to negotiate in good faith actually to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to serve as writer-director of "Midnight Sun."

108.   PLAINTIFF is informed and believes and thereon alleges that defendants' breaches damaged WOLF in an amount to be proven at trial, but believed to be at least $1,000,000.

## FOURTH CLAIM FOR RELIEF
### BREACH OF CONFIDENCE
#### (*Against All Defendants other than Open Road*)

109.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

110.   On October 11, 2012, defendants RICKARD and OU received novel information from PLAINTIFF under circumstances by which they incurred an obligation not to use or disclose the information without WOLF's consent.

- 38 -

111.   PLAINTIFF is informed and believes and thereon alleges that at some point between October 11, 2012 and June 22, 2015, RICKARD and OU made one or more unauthorized uses or disclosures of the information without WOLF's consent, in breach of their duty of confidence to WOLF, and which caused WOLF to suffer damage.

112.   RICKARD and OU induced PLAINTIFF to forebear on bringing any claims that might have had by February 2013 by further express or implied-in-fact promises not to use or disclose "Midnight Juliet" without PLAINTIFF's permission, and such promises were either always false or were breached, such that any claims that PLAINTIFF had as of February 2013 either did not accrue and/or were tolled and/or RICKARD and OU are estopped from asserting time bars with respect to such claims, until at least June 22, 2015.  PLAINTIFF could not reasonably have discovered the unauthorized uses or disclosures prior to June 22, 2015 at the earliest under all the circumstances here.

113.   PLAINTIFF is informed and believes and thereon alleges that all defendants other than RICKARD and OU are liable to PLAINTIFF for RICKARD and OU's breaches of confidence under one or more applicable theories of vicarious liability, including agency, ratification, concert of action, aiding and abetting, and/or successor liability by principles of assignment.

## FIFTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY (CONSTRUCTIVE FRAUD)
#### *(Against All Defendants other than Open Road)*

114.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

115.   PLAINTIFF and defendants RICKARD and OU entered into a writer-director attachment relationship with respect to the business opportunity of a remake of "Taiyo no Uta" (to be entitled "Midnight Sun") using the "Midnight Juliet" treatment

COMPLAINT

and/or synopsis, pursuant to which defendants RICKARD and OU owed fiduciary duties to WOLF, including without limitation:

    a.  A duty affirmatively to notify WOLF if and when "Midnight Juliet" was used in the "Midnight Sun" project, including to allow WOLF an opportunity to negotiate in good faith to perform writer-director services on the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance for WOLF actually to perform writer-director services.

    b.  A duty, in dealing with third parties regarding the project, to protect and not to waive or otherwise unreasonably impair WOLF's opportunity to negotiate in good faith to perform writer-director services on the "Midnight Sun" project, upon defendants' intention actually to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance for WOLF actually to perform writer-director services.

    c.  A duty, in dealing with third parties, affirmatively to inform them timely and accurately of the existence, nature and terms of WOLF's attachment to the "Midnight Sun" project.

116.   PLAINTIFF is informed and believes and thereon alleges that defendants breached their fiduciary duties to WOLF with respect to the "Midnight Sun" project and "Midnight Juliet" in at least the following ways:

    a.  Failing to notify WOLF that defendants had used "Midnight Juliet" in the "Midnight Sun" project in a timely fashion or at all.

    b.  Failing to afford WOLF an opportunity to negotiate in good faith actually to perform services as writer-director of the "Midnight Sun" project, upon defendants' acquisition of the remake rights to "Taiyo no Uta" and use of "Midnight Juliet" in the remake project, pursuant to floors established by

guild rules, industry custom and practice, and/or WOLF's quotes.

    c.  Failing to notify third parties of the existence of WOLF's attachment as writer-director and her rights thereunder.

117.  PLAINTIFF is informed and believes and thereon alleges that the above breaches lead to an advantage or advantages gained by defendants.

118.  PLAINTIFF justifiably relied on defendants' misrepresentations and/or omissions, including without limitation defendants' failure affirmatively timely to inform WOLF that defendants intended to and were using "Midnight Juliet" in the "Midnight Sun" project.

119.  Defendants' conduct misled WOLF to her prejudice, including by depriving her of the opportunity to negotiate in good faith to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention to use "Midnight Juliet" in the "Midnight Sun" project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to perform writer-director services.

120.  PLAINTIFF is informed and believes and thereon alleges that all defendants other than RICKARD and OU are liable to PLAINTIFF for RICKARD and OU's breaches of duty under one or more applicable theories of vicarious liability, including agency, ratification, concert of action, aiding and abetting, and/or successor liability by principles of assignment.

121.  Defendants, and each of them, did the things herein alleged maliciously, knowingly, willfully and with the deliberate intention of injuring and oppressing WOLF and with conscious and reckless disregard of her rights.  Defendants' conduct was malicious and oppressive and fraudulent, and, by reason thereof, WOLF is entitled to exemplary and punitive damages in an amount according to proof at trial.

///

///

///

# SIXTH CLAIM FOR RELIEF

## FRAUD

### *(Against All Defendants other than Open Road)*

122.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

123.   On or about October 11, 2012, in an arranged pitch meeting at RICKARD's and OU's Rickard Pictures offices on Robertson Boulevard in Los Angeles, defendants RICKARD and OU made the following affirmative representations and/or promises to WOLF:

a.   If WOLF pitched one or more of her original motion picture projects that she was keeping in reserve until and unless she had an opportunity to be attached and/or to be writer-director of the project, then if RICKARD and OU decided to use such project, the terms would include attachment of WOLF as writer-director (which the parties on both sides understood would carry the obligations of attachment as set forth elsewhere herein).

b.   If WOLF delivered a copy of her written treatment and synopsis for "Midnight Juliet" to RICKARD and OU, then if RICKARD and OU used the treatment in a remake of the Japanese film "Taiyo no Uta," (which RICKARD and OU may have called "Midnight Sun"), then WOLF would be attached as writer-director of the remake (which the parties on both sides understood would carry the obligations of attachment as set forth elsewhere herein).

124.   On or about October 11, 2012, defendants RICKARD and OU made essentially the same affirmative representation as set forth in b., above, telephonically to WOLF's then-manager (Magnet Management, and specifically, as PLAINTIFF recalls, Bob Sobhani).  Defendants RICKARD and OU reaffirmed their commitment to the representations and promises above in multiple additional communications to WOLF and/or Magnet Management later in October 2012 and after.

125.   In or about February 2013, RICKARD and OU made affirmative representations and/or misleading omissions and/or false promises to PLAINTIFF and/or Magnet Management (PLAINTIFF is informed and believes and thereon alleges specifically to Bob Sobhani of Magnet), to the effect that if PLAINTIFF would forebear on bringing any claims that she might have had against RICKARD and OU as of February 2013, RICKARD and OU would not use or disclose "Midnight Juliet" at all, and specifically would not do so in connection with "Midnight Sun."

126.   The above representations and promises were material to WOLF, and she would not have acted as she subsequently did without them.

127.   PLAINTIFF is informed and believes and thereon alleges that when RICKARD and OU made the above affirmative representations and/or promises, that the representations and/or promises were false, RICKARD and OU knew that they were, and RICKARD and OU had no intention of performing the promises.

128.   PLAINTIFF is informed and believes and thereon alleges that RICKARD and OU made the false representations and promises with the intent to induce WOLF to alter her position to her injury and risk.

129.   PLAINTIFF justifiably relied on defendants' representations and promises.

130.   Defendants' conduct misled WOLF to her damage and prejudice, including without limitation by causing her to disclose her "Midnight Juliet" project to RICKARD and OU, and by delivering copies of her written "Midnight Juliet" treatment and synopsis to RICKARD and OU, when she would not otherwise have done so, had she known the true facts, and by causing WOLF to forebear from bringing claims earlier when she might have otherwise done so.  Among other damage, WOLF was denied the opportunity to negotiate in good faith to perform services as writer-director of a commercial project utilizing her "Midnight Juliet" property, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance actually to serve as writer-director of the project, as well as being

///

denied the opportunity not to identify or deliver her "Midnight Juliet" treatment and synopsis to RICKARD and OU at all.

131.   PLAINTIFF is further informed and believes and thereon alleges that all remaining defendants other than RICKARD and OU ratified RICKARD and OU's fraudulent conduct and/or accepted the benefits thereof after being on notice of same, or are otherwise vicariously liable for RICKARD and OU's fraud.  PLAINTIFF is informed and believes and thereon alleges that all defendants other than RICKARD and OU are liable to PLAINTIFF for RICKARD and OU's breaches of duty under one or more applicable theories of vicarious liability, including agency, ratification, concert of action, aiding and abetting, and/or successor liability by principles of assignment.

132.   Defendants, and each of them, did the things herein alleged maliciously, knowingly, willfully and with the deliberate intention of injuring and oppressing WOLF and with conscious and reckless disregard of her rights.  Defendants' conduct was malicious and oppressive and fraudulent, and, by reason thereof, WOLF is entitled to exemplary and punitive damages in an amount according to proof at trial.

## SEVENTH CLAIM FOR RELIEF
### NEGLIGENCE
### *(Against All Defendants other than Open Road)*

133.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

134.   PLAINTIFF and defendants RICKARD and OU entered into a writer-director attachment relationship with respect to the business opportunity of a remake of "Taiyo no Uta" (to be entitled "Midnight Sun") using the "Midnight Juliet" treatment and/or synopsis, pursuant to which defendants RICKARD and OU owed a duty of care to WOLF, which duty of care included at least the following aspects:

a.   A duty affirmatively to notify WOLF if and when "Midnight Juliet" was used in the "Midnight Sun" project.

b.     A duty, in dealing with third parties regarding the project, to protect and not to waive or otherwise unreasonably impair WOLF's opportunity to negotiate in good faith to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, with some real chance for WOLF actually to perform writer-director services on the project.

c.     A duty, in dealing with third parties, affirmatively to inform them timely and accurately of the existence, nature and terms of WOLF's attachment to the "Midnight Sun" project.

135.    PLAINTIFF is informed and believes and thereon alleges that defendants RICKARD and OU breached their duty of care to WOLF with respect to the "Midnight Sun" project and "Midnight Juliet" in at least the following ways:

a.     Failing to notify WOLF that defendants intended to use or had used "Midnight Juliet" in the "Midnight Sun" project in a timely fashion or at all.

b.     Failing to afford WOLF an opportunity to negotiate in good faith to perform services as writer-director of the "Midnight Sun" project, upon defendants' intention to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance for WOLF actually to perform writer-director services on the project.

c.     Failing to notify third parties of the existence of WOLF's attachment as writer-director and her rights thereunder.

136.    PLAINTIFF is informed and believes and thereon alleges that the above breaches of duty by RICKARD and OU were a substantial factor in causing injury to PLAINTIFF.

137.    The negligence of RICKARD and OU damaged WOLF, including by depriving her of the opportunity to negotiate in good faith to perform services as writer-

director of the "Midnight Sun" project, upon defendants' intention to use "Midnight Juliet" in the remake project, pursuant to floors established by guild rules, industry custom and practice, and/or WOLF's quotes, and with some real chance for WOLF actually to perform writer-director services on the project.

138.   PLAINTIFF is further informed and believes and thereon alleges that all remaining defendants other than RICKARD and OU ratified RICKARD and OU's improper conduct and/or accepted the benefits thereof after being on notice of same, and are liable for RICKARD and OU's negligence as a result.  PLAINTIFF is informed and believes and thereon alleges that all defendants other than RICKARD and OU are liable to PLAINTIFF for RICKARD and OU's breaches of duty under one or more applicable theories of vicarious liability, including agency, ratification, concert of action, aiding and abetting, and/or successor liability by principles of assignment.

## **PRAYER FOR RELIEF**

### *First Claim for Relief (Copyright Infringement)*

1.   For actual and compensatory damages.

2.   For statutory damages.

3.   For any gains, profits and advantages obtained by defendants, or the value thereof.

4.   For attorneys' fees.

5.   For a temporary, preliminary and permanent injunction appropriately tailored to prohibiting defendants or any of them from making any further unauthorized copying, distribution or preparation of derivative works from PLAINTIFFS' copyright works or any of them, or of any derivate work thereof, including without limitation the KIRSTEN "Midnight Sun" Screenplay, and the "Midnight Sun" motion picture based thereon, beyond what is equitable under the circumstances.

6.   For PLAINTIFF'S costs of suit.

7.   For such further relief as the Court deems just and proper.

COMPLAINT

*Second Claim for Relief (Breach of Contract)*

8.      For general damages in amount to be proved at trial but believed to be at least $1,000,000.

9.      For such other general damages as may be shown by proof at trial.

10.     For prejudgment interest at the legal rate from at least June 22, 2015.

11.     For PLAINTIFF'S costs of suit.

12.     For such further relief as the Court deems just and proper.

*Third Claim for Relief*

*(Breach of the Covenant of Good Faith and Fair Dealing)*

13.     For general damages in amount to be proved at trial but believe to be at least $1,000,000.

14.     For such other general damages as may be shown by proof at trial.

15.     For prejudgment interest at the legal rate from at least June 22, 2015.

16.     For PLAINTIFF'S costs of suit.

17.     For such further relief as the Court deems just and proper.

*Fourth Claim for Relief (Breach of Confidence)*

18.     For general damages according to proof at trial.

19.     For punitive damages.

20.     For prejudgment interest at the legal rate from at least June 22, 2015.

21.     For imposition of a constructive trust upon all monies or other consideration received or to be received by defendants to this claim from production and distribution of the "Midnight Sun" motion picture and/or any exploitation of the KIRSTEN screenplay.

22.     For PLAINTIFF'S costs of suit.

23.     For such further relief as the Court deems just and proper.

COMPLAINT

*Fifth Claim for Relief (Breach of Fiduciary Duty (Constructive Fraud))*

24.  For general damages according to proof at trial.

25.  For punitive damages.

26.  For prejudgment interest at the legal rate from at least June 22, 2015.

27.  For imposition of a constructive trust upon all monies or other consideration received or to be received by defendants to this claim from production and distribution of the "Midnight Sun" motion picture and/or any exploitation of the KIRSTEN screenplay.

28.  For PLAINTIFF'S costs of suit.

29.  For such further relief as the Court deems just and proper.

*Sixth Claim for Relief (Fraud)*

30.  For general damages of no less than $1,000,000.

31.  For punitive damages.

32.  For prejudgment interest at the legal rate from at least June 22, 2015.

33.  For imposition of a constructive trust upon all monies or other consideration received or to be received by defendants to this claim from production and distribution of the "Midnight Sun" motion picture and/or any exploitation of the KIRSTEN screenplay.

34.  For PLAINTIFF'S costs of suit.

35.  For such further relief as the Court deems just and proper.

///
///
///
///
///
///
///

COMPLAINT

***Seventh Claim for Relief (Negligence)***

36.    For general damages according to proof at trial.

37.    For PLAINTIFF'S costs of suit.

38.    For such further relief as the Court deems just and proper.


Dated: December 8, 2016                    ANDERSON YEH PC

                                    By: _____
                                          Edward M. Anderson
                                Attorney for Plaintiff BETHANY ASHTON WOLF

- 49 -

COMPLAINT

**DEMAND FOR JURY TRIAL**

On her Complaint against defendants JOHN RICKARD, ALAN OU, WRIGLEY PICTURES, BOIES/SCHILLER FILM GROUP LLC, ERIC KIRSTEN, MIDNIGHT SUN, LLC, OPEN ROAD FILMS, LLC and DOES 1 to 20 inclusive, plaintiff BETHANY ASHTON WOLF hereby demands a trial by jury of all matters triable to a jury.

Dated: December 8, 2016                    ANDERSON YEH PC

By: _____
                    Edward M. Anderson
            Attorneys for Plaintiff BETHANY ASHTON WOLF

DEMAND FOR JURY TRIAL